Good morning, everyone. Judge O'Scanlan and I are pleased to welcome back Judge Seiler. He sat with us yesterday as well. We always enjoy his visit. Thank you, Judge Seiler. I'm pleased to be here. I'm calling the cases in the order they're listed. The first one, Singh v. Barr, has been submitted on the briefs and record. So the first case up for argument is Ridgeway v. Wal-Mart. Thank you, Your Honor. May it please the Court, Theodore Boutrous for Wal-Mart. I'd like to reserve three minutes for rebuttal. Certainly. This minimum wage case must be considered against the backdrop of both the purpose of the minimum wage law, which is to provide a living wage for individuals, and of Wal-Mart paying the highest wages in the trucking industry, and often in excess of $100,000 a year, and having one of the lowest attrition rates in the industry, and the fact that the primary component of the $54.6 million verdict is for the 10-hour layover periods where drivers were prohibited from working and, in fact, were free to engage in rest and sleep, leisure activities, recreational activities away from their truck. The Court ---- Well, the procedural posture says it's post-trial now. So I take it that your primary challenge is really to the district court's determination on the layover issue during the summary judgment stage, because whatever arguments you have about what truckers were permitted to do, you were allowed to argue that at the trial stage, correct? It really ---- The summary judgment ruling, I think of it as the original sin of the case where the Court got it wrong and found that based on the plan, the written pay plan alone, Wal-Mart controlled the drivers, and that if the written plan was applied, the Court held and told the jury, then Wal-Mart had to compensate for every minute of those 10-hour layovers. And that was, Your Honor, simply wrong. At summary judgment, the written plan itself does not say that drivers must take their layovers in the truck. And it simply says that if you want to be paid the $42 inconvenience fee, this is in our ---- it's on page 977 and 1471 of the excerpts of the record, that to get paid the gratuitous inconvenience fee, the layover needed to be taken in the truck. It doesn't say that you have to take the layover in the truck. And, in fact, the testimony at summary judgment from Mr. Arett, who is the representative ---- the witness for Wal-Mart said there are no restrictions about where and when a driver can stop to take his layover so long as he parks in a safe and legal place. Drivers may drive outside of their routes in order to find a place where they would feel comfortable for the layover. And this is docket number 190.1. So the Court found at summary judgment, though, there was control as a matter of law based on the policy, and then told the jury that. And we think at a bare minimum, that requires reversal in a new trial. Scalia, in effect, does that supplemental instruction do to this? Your Honor, the supplemental instruction really didn't help at all. And, in fact, I think it shows that the jury was wondering what could be worse for the jury, and ruled that there was previously found that the policy stated in Wal-Mart's driver pay manual subjected drivers to control during layover periods. The supplemental instruction came when the jury asked what that meant, literally what control in those lines of the jury instruction meant. The Court explained what control meant, but did not say that this instruction was superseded or that it otherwise wasn't applicable. So the jury was told, if Wal-Mart followed its policies, then you must find control. And we think that was highly prejudicial. So you're challenging two sets of instructions, the jury instruction number 16, which is the one I think you've just been referring to, as well as the original one? Yes. Yes, Your Honor. And also the instruction that went to the minimum wage claims regarding rest breaks and inspections. The Court, there were two instructions, one at the beginning and one at the end of the trial, that suggested that those were designated as unpaid, and that if Wal-Mart had followed its policies, then those, too, were uncompensated, which just wasn't correct. Wal-Mart intended to pay for those rest breaks and inspections, and should have been entitled to prove, and the driver should have been required to prove, that they weren't unpaid. That's the other thing in this case. Just jumping to the class certification issue, none of the named plaintiffs proved their case. And this was class action in reverse. The — for example, one of the named plaintiffs testified that he never took rest breaks, and he was supposed to be representative of a class of people who weren't paid for rest breaks they took. And so we have a situation where the expert testimony was used to create a fictional composite plaintiff that doesn't exist based on averages looking at, I think, 40 — 40 class members that didn't include the named plaintiffs. So we have a situation where no individual plaintiff proved that they were compensated at less than minimum wage for any single hour. No driver proved that they were deprived of their freedom and their ability to do what they wanted on their layover. So it really is a class without — a headless class, as we called it. And that started at the beginning, that this has been sort of — they're excellent lawyers, but it's been a lawyer-driven class. When the stay was lifted in 2012, the plaintiffs found that two of the class — the named plaintiffs had died. One was no longer interested in being the named plaintiff. And the plaintiff's lawyers disclosed that they no longer felt comfortable having the last person be the class representative. So they got some other plaintiffs identified from Wal-Mart, right? They sought an order from the district court seeking discovery so that they could find new plaintiffs. And as we argue, Judge Siler, that was just beyond the jurisdiction of the district court. I look at it this way. If my friends on the other side had brought a case for one plaintiff for injury, and then that plaintiff decided they didn't want to go forward, could they have come into court and said, my client doesn't want to go forward, will you help, can I get discovery to find another injured person? And the court would, of course, say no. And the only reason that this was allowed to go forward was because it was a putative class action at that point. But as the Supreme Court held in the standard fire case, which we cite, the fact that there's an uncertified class doesn't change the rules, doesn't change the power of the court. So the court would say, well, we're going to go forward, we're going to go forward. Sotomayor, you mentioned what happened to several of them. But wasn't there one remaining who would qualify? Isn't that enough to retain jurisdiction? There was one remaining, Your Honor, who did not. I mean, it's fine, though. I've got the exact language. The counsel informed our side that they were not going to be able to carry forward with him and the others as class representatives, and they disclosed, we don't have complying class reps to sign individually the alternative dispute resolution form. So he was the technically, and I know the plaintiffs argue this, they hadn't dismissed that person, but there wasn't a controversy that that individual wanted to press against Walmart in court. So that's why we think this, under Spokio and Campbell-Ewald, that person decided they didn't want to litigate, so there wasn't a case or controversy that gave the court the authority to order discovery. Article III courts don't sit to assist people in finding clients, and the fact that it was a class action does not change that equation. So of the four plaintiffs, two had passed away, one didn't want to press the lawsuit any further. And what about the presence of the fourth one? I know there were some concerns about adequacy of that remaining plaintiff, but that plaintiff was still there. That plaintiff was still there, Your Honor, but at that point, I go back to the example of the individual case. The lawyers had a client who did not want to press the case, and they did not want to represent that client. So they needed to find another client, and this was four years after the original case. And so, yes, technically the person was in the case, but in terms of a live case or controversy, and we've cited cases from, you know, where the Reed case from the Tenth Circuit, other cases where courts say the fact that the person may still be in the case, if they're not willing to come into court and litigate, and there was no evidence that that person was, there wasn't a case or controversy. And yet we've had years of litigation since then, and I go back to the class certification issues. The expert's testimony is divorced from the individuals who were inserted in the case. So even at the end of the case, we really didn't have individuals who were representative of a class. We had averages created by an expert that contradicted the experiences of the individuals. The case was still in court at that point. It hadn't been dismissed by the district judge. That's true, Your Honor. So it was in court, but you didn't see the name, the last named plaintiff in court. You saw the lawyer saying, we don't think this person can be representative. We need new plaintiffs, and they filed that motion. And so we think that's a real jurisdictional case, but it also is a problem that requires everything to be vacated. But I'd like to just go back to the layover point on the issue of the legal question, because I think two cases from this Court, two decisions, and the recent Department  of Justice, the main thrust, the core holding of the district court and the plaintiff's arguments were that because Walmart paid a $42 inconvenience fee to drivers who decided to stay in the sleeper berth, that was a — that showed control, and that allegedly — we don't think this is correct, but assume it is — they could only get that fee if they stayed in the sleeper berth. That meant that they were, under California law, under control, and therefore needed to be compensated for the whole 10-hour period. This Court's decision in the Nance case, applying Oregon law, which is very similar, said that, look to Federal regulations which prohibit drivers from working. These are mandated by Federal law. It's to give the drivers rest. Uncompensated, even when the truck was moving. Kagan. What about the elements of the written policy that the district court was — that the district court thought exhibited control? The exceptions must be pre-approved by management, and also that you have to park the truck at certain locations and under certain conditions. Those fall in the category, Judge Wynn, of the practical limitations that, for example, in the Augustus v. ABM case, the California Supreme Court said the fact that there are practical limitations, if you — in that case, it was — you had a 10-minute break, therefore, you weren't able to go anywhere you wanted. You were limited by where you were. And so — and talked to — and in the Taco Bell case, which I was about to get to from this Court, which came out after our opening brief, where the Court said the fact that a person could voluntarily choose to get a discounted meal from Taco Bell when they were working there, but then had to eat the meal on the premises and couldn't eat it in certain areas. So there was a degree of control. That wasn't the sort of control that required compensation because it was voluntary. And here, back to your first question, Your Honor, the plan itself, it said a layover is earned when taking a mandatory DOT break and is not paid in conjunction with any other type of pay. The intent is to pay drivers for layovers taken in the tractor cab. And then the exceptions say that permission to get a paid layover — and there's no pay required under Federal law or California law. Nobody else pays for these layovers. Walmart is giving more pay than is required, and yet we have a verdict that is requiring it to pay for 10 hours for everyone, even if they went water skiing or went to a casino or went — went out and just did things on their own, which they did. Did they have to get permission from Walmart to do this? No, Your Honor. And in fact, the — the record — that was why, going back to the summary judgment, Mr. Arett, as I mentioned, his declaration said drivers are not required to stay in their trucks throughout the layover. In my experience in dealing with drivers, almost all of them do leave their vehicles to eat at a restaurant, go for a run, take a shower, use a restroom. And the testimony is this time is their time. That's what Federal law requires. And so under this Court's decision in Taco Bell, some — the fact that you voluntarily say, I'll take the $42. If I stay at home, I don't get the $42, that's your choice. If you stay at home, you can stay at home. And that's what the record reflected. There were some drivers who testified at trial that they thought they had to stay in the truck. But that raises individualized issues that really go to, again, why there should never have been a class certified on these issues. Drivers are doing different things every day, highly individualized. Their testimony shows that. And that's why we think judgment as a matter of law should be entered — the case should be resourced and, at a bare minimum, a new trial in the class decertified. And I'll reserve the rest of my time, if I may. Thank you. All right. Thank you, Your Honor. Michael Rubin, may it please the Court. There was a lot packed in there, but let me start with the question that Judge Seiler just asked and the response about permission. I'm going to focus on the layovers first. I'll get back to the case or controversy. The evidence fully supports the properly instructed jury's special verdicts. Yes, the manuals do say that advanced permission is required, and they're phrased in the conditional. They say, if approved, the testimony of witness after witness is, first, that the drivers needed permission from a manager to sleep anywhere other than their tractor cab. There are dozens of witnesses who said that. The layovers have to be in a safe, secure area. Richard Byers, they couldn't conduct personal errands. You had no place to sleep but inside the cab, Willie Franklin. More importantly, permission was not always granted to leave the cab. You could ask, but first, you had to be in a safe, secure location. And as James Easterling said, if you're hauling like a load of computers or a load of TVs or something like that, they're going to say no. You have to go somewhere else and stay, and then you have to stay with the truck. It depends on what you have in the truck, how full it is, and where it is, whether you're given permission or not. So this is not automatic. This is not like Taco Bell, where each employee decides for himself or herself whether to take a discounted meal. You must stay with the truck unless given permission to leave, and that permission may be denied. And if you don't get permission, then you may be in the situation of, for example, Willie Franklin, who was fired. Walmart conducts truck checks. Many witnesses testified about that. They have operations managers and safety managers who come by during layovers to see where the truck is parked and whether the driver is inside of the cab of the truck. Willie Franklin testified this. Did the jury hear this evidence? Absolutely. Willie Franklin, SCR 259 to 60, said he was fired after the third truck check. He had been napping. Although his truck was parked in a distribution center, he was napping. He was nearby napping, and he was fired. Direct directions from Bentonville, Arkansas. Serrano Moseen said that his colleague Dick Poston, this is SCR 326, Dick Poston was fired for being home without permission. David Jennings, 361. Richard Byers, 317. Same thing. Walmart did, in fact, discipline people for not being sleeping in the truck for the full time without having asked permission. This was for Walmart's ---- Walmart had some witnesses who said they could just do anything they wanted to, as counsel has stated here. They had some, and Judge Ilston disregarded it, said that that was, quote, equivocal testimony at best. But even so, if the witness --" I'm sorry. If the jury was properly instructed, there is ample evidence, certainly more than substantial evidence, necessary to sustain the verdict. So getting back to Judge O'Scanlan's question, was the jury properly instructed? The answer to that is the supplemental instruction on the layovers. Because the jurors ---- What about jury instruction number 16, line 12? The Court has previously found that the policy stated in the pay manual subjected drivers to Walmart's control during layover. Yes. But that's, as I understand, that's what counsel's concern is, that that was ---- That is exactly what counsel's concern was, and that they disagreed. And that's an inaccurate instruction, is it not? No. That is a completely accurate description, because that is what the judge found and explained why she found it on partial summary judgment, but even if that were error, and it isn't, because ---- But isn't that a jury question? No. No. The judge repeatedly emphasized the distinction between what is stated in the manual and what happens in actual practice. And the judge said, all I've decided is what happened, what the manual states, and it's up to the jury to decide what happened in actual practice. And this is what the supplemental instruction says. And critically, after giving the supplemental instruction, Walmart accepted it. Walmart not only didn't object to the supplemental instruction, but it affirmatively said what you just proposed is a fair compromise, we can live with that. That's 295 to 296. So what did she say? When the jury asked, Judge Oscano, and focusing specifically on the language you identified, what does, quote, the jury instruction has it in quotes, the transcript doesn't, Walmart control mean in lines 12 to 13, the judge said, to determine, this is the instruction, to determine if a driver was subject to Walmart's control during the layover, which was the principal issue at trial, which all the witnesses were talking about, you must determine whether the driver was able to use that time effectively for his or her own purposes. She then gave the two examples, the first one from Mendiola and Bono, which said that when an employer directs, commands, or restrains an employee from leaving the workplace, and that's exactly this case, because you have to stay with the cab during the 10-hour layover, then that can be control. And then she quoted from the Meridian versus Royal Packing, the California Supreme Court case, when the agricultural workers have to take the bus, even if they can read on that bus and perform other personal activities, if the location is restricted, if you are not permitted to move wherever you might like to move, and the testimony of witness after witness said, for Walmart's benefit to protect, as security guards do, the contents of the truck, and to save fuel for Walmart's benefit, so you can't turn around and go home without permission, which wastes fuel, you have to stay with the truck unless a manager concludes that the truck is sufficiently empty or the goods have certain values, and you are parked at a Walmart distribution center that has ample security. Otherwise, you're not going to be given permission and you risk being fired as Dick Post and Lee Franklin were. Now, the cases, I talked about Taco Bell briefly there, the evidence was undisputed on summary judgment that each employee could make the unilateral choice whether to take the discounted meal or not. In Mendiola, the on-call security guards, and this is the California Supreme Court, could engage in, I'm quoting from page 842, engage in personal activities, even sleeping, showering, eating, reading, watching television, and browsing the Internet. They could also leave the premises on request if there is relief of available. That's very similar to this case, and that is one of the cases that in the supplemental instruction, Judge Ilsen instructed the juries about. Similarly, in Marilia ---- Kagan. I think the instructions were faithful to the district court's decision on partial summary judgment. So let's go back to that decision on summary judgment, because I think that that ruling then drove the way the instruction, the original instruction was formulated with regard to the layover issue. Then when the jury had a question about that, then the supplemental instructions were issued. On the written policy, did the district court err by essentially taking the legs out of Wal-Mart's case by not allowing them to argue whether the written policy was susceptible to a different interpretation? So counsel is essentially arguing that, look, you don't get paid during these mandatory breaks unless you take it in the cab. So all of these things, getting permission and so on and so forth, really address the situation where you want to get paid if you stay at home. How do you respond to that? Why shouldn't that question have also gone to the jury? It's a two-fold question. The one is that any error in partial summary judgment is necessarily harmless in light of the evidence presented to the jury as Judge Ilsen ---- Well, not harmless in the sense that it drove the jury instruction, right, that the written policy as written, if applied as written, essentially would dictate the jury's verdict in favor of the plaintiffs. But then what the jury was asked to decide is regardless of what the manual stated and of course the witnesses said the manual was followed, regardless of what the manual stated and whether that is control on its face, you must, quote, determine if a driver was subject to Wal-Mart's control. But let me go back to your question about the ---- So I just want to make sure you understand that last question. So it doesn't really matter that partial summary judgment was granted because ultimately all issues regarding the extent of control was given to the jury. Is that your response? That's right. And that's why Judge Ilsen, when Plaintiffs' Counsel objected to the giving of a supplemental instruction, said, no, I'm going to give it because the jury has listened to weeks of testimony about control during layovers, and it's their decision to make. But getting back to the first question you asked about the partial summary judgment motion, she was right. So it's not as though we needed the supplemental instruction to cure an error. For the reasons stated in her order, the manual on its face does, in fact, say only after receiving approval from a member of the transportation management is it permissible to take your layover break at home. If approved, you must safely and legally park in a secure location, and the intent is to pay drivers for layovers taken in the tractor cab. Any exceptions must be approved prior to the layover. The following are unacceptable and may lead to immediate termination, unauthorized break at home. That, if applied by its terms, is control under the California cases that I cited. So she was right on partial summary judgment. But even if she weren't, my point is it makes no difference because the jury was properly instructed, must be presumed to have followed the instructions of the Court. As to case or controversy, if I may move on to that point, there were – there was a case or controversy, as Judge Ilson found. There were two plaintiffs who did not die, although, as we pointed out, the – under California law, a wage and hour claim goes to the estate. Kagan. But they didn't want to press the lawsuit any longer, right? No, that's not true. Donald Bryan, the evidence shows he lost interest, but he never withdrew. These – and he still is in the case. He no longer is a class representative. There's a distinction between a class representative and a member of the class. And for a case or controversy, you have to have a plaintiff who has a valid claim or – or is asserting a claim. But he wanted to stay as a class member, but he didn't want to be a – a name. He remains and remains to this day as a class member. Similarly, Carroll Hampton, there were concerns that counsel expressed about his ability to continue to adequately represent the class. Well, what about the specific statement that Mr. Boutros made in his presentation with respect to that last one? I don't see that in the record. What they quoted in the briefs — It's not in the record? No, Your Honor. What they quoted in the briefs was the – was the FER-232. That's a declaration from counsel. That's a declaration from counsel about what he – a transcription of a voicemail which simply said, and I'm quoting from the declaration, Carroll Hampton is interested in backing out as a class representative. It doesn't say he has no claim. He is not pursuing a claim. Mr. Hampton is interested in backing out. That's – that's projecting ahead to the future. So as long as any plaintiff continued to have a claim, there was a case or controversy. I want to move to the Cross Appeal, if I may. Before you, just a quick question. What about the question of whether that last individual was representative of the – as a qualified member? You heard counsel's challenge to — Yes, he's a qualified – he still has a claim. He will recover if this decision is affirmed. There's a difference. Two years later, there was class certification. There were different reps at the time. There was no adjudication of his adequacy two years before the class certification motion was even filed. What Plaintiff's counsel said is in the voicemail, which I don't think is even admissible evidence, but the voicemail said that in the future he is – he may not continue as the class representative. There's nothing said about his not having a claim or no valid claim. And that's FER 232. As to the Cross Appeal, two principal points. Obviously, liquidated damages under 1194.2 are the norm, not the exception. This Court has repeatedly held as much. This provision is modeled on the FLSA. There were two principal errors. The first is the acceptance of Mr. Parrish's declaration, which Plaintiffs objected to, said they had no opportunity to cross-examination – to cross-examine and, besides, lacked foundation and was hearsay, because that was the only evidence of subjective good faith. And he repeatedly says in paragraphs 4, 7, 8, and 12 what Wal-Mart understood or intended without any basis for that. And then, even more important, the five factors that Judge Ilston identified did not pertain to the specific violations. They talked about, as Mr. Boutros did, the policy overall, the low attrition, the high compensation. But what 1194.2b specifically says is that you get liquidated damages unless the employer can prove that the particular act or omission giving rise to the minimum wage violation was in subjective good faith, and, two, the employer had reasonable grounds for believing the act or omission. So at a minimum, we need a remand on the liquidated damages issue because Judge Ilston, in addition to relying on a declaration that lacked foundation and was not subject to cross-examination and was properly objected to, stated as her reasons five factors, including citing testimony that she had previously struck herself without realizing she had done that, five factors that did not tie to the particular layover, pre- and post-inspection, and rest-break violations that were at issue. And that was definitely reversible error that authorizes at least a remand. Thank you. Kagan. Thank you, counsel. Let's add another minute on the clock. Thank you, Your Honor. Let me go back to the instruction. It cannot be overstated how prejudicial that instruction was. The jury was told that the court found that the policies controlled, and if there was control, Walmart was liable. And unless Walmart didn't apply its own policies, game, set, match. And if counsel, I'm going to have to say, I urge the Court, check our briefs and our citations of the record. I don't think that counsel is accurately reflecting what happened at trial. And I'll say, in this plaintiff's closing argument, the judge in another instruction on the layover instruction has already ruled that the pay policy, that the pay manual subject the drivers to the control of Walmart during their 10-hour layover. Then in rebuttal, after we made our arguments, Mr. Artinian said, he asked you to decide whether the drivers were subject to Walmart's control during layover periods. You don't get to decide that. The judge is told during the instruction the court has found the pay policy as written subjects Walmart drivers to control during layover periods. But the supplemental instruction came after that, right? It did, Your Honor. And it didn't say this is a correction. Earlier in the case, as we pointed out, the Court did correct an instruction and said this is a superseding instruction. So the jury said, literally pointing to the lines in the instruction where the judge said the court has found control, the jury said, please tell us what control means. And so you want the jury to find that Walmart did not have control even though the handbook said it did? We wanted to be able to — one, we don't think that the handbook did say that. And, in fact, the judge got it wrong at summary judgment. There was a declaration explaining that drivers were free to take their break anywhere they wanted. How can you decide at summary judgment that the policy actually says there's control? But that and that came to — But isn't that cured then by the supplemental, which says you get to decide whether the driver was able to use that time effectively for his or her own purposes? Well, I think the court was just — the court didn't tell the jury, ignore what I told you before. The court was defining control as the jury asked for it. At a bare minimum, it was completely confusing. In the record, Your Honors, throughout the trial, plaintiffs were objecting when Walmart would try to put on evidence of what the practice was. They would object and talk about the prior rulings. And so it was just a mess, and it was highly prejudicial. And the jury, by asking that question, was confused. This Court's cases say that if they're going to correct an instruction, it needs to be — the jury needs to be told the other instruction was incorrect. This is now your instruction. Here, the court just said you asked what control meant. Here's what it meant. Go on. Did you ask the court to do that? We did not. The jury asked the question, and then Walmart did say that's a fair compromise if we're going to define control. But it did not concede that this — that the prior instruction had somehow been remedied. And I know the court gave me a little more time. On this question of — But we've actually taken you over time. Oh. But I have a question, which I may — Thank you, Your Honor. I'm troubled by Mr. Rubin's assertion that the statement you made earlier was not in the record. Can you elucidate, please? That's just incorrect, Your Honor. In fact, we cited those materials. It's — if you — Your Honor, it's in the — the further excerpts of the record, page 238. This was the evidence we put before the district judge as to what the plaintiffs told us about the — the plaintiffs. So it was a voicemail from counsel that said that one plaintiff was interested in backing out as class rep, were not going to be able to carry forward with them as class representatives. So it's in — it's in this record. It was before the district court. And so that's just inaccurate. In page 16 of their brief, they cite ER-242 and say it is true that two plaintiffs died, one informed plaintiffs' counsel that he had lost interest in continuing as class rep, and the fourth was the subject of some concerns by plaintiffs' counsel about whether he continued. So it's in the record. The district court said that the problem was that they did not have class representatives, but because of the unusual circumstances, the court could use the Article III machinery to help them recruit new clients. And we respectfully submit that's not appropriate and the court should reverse. Thank you very much. Our thanks to counsel for your arguments today. The matter is submitted for decision.
judges: O'scannlain, Siler, Nguyen